Fairmont Aluminum Company v. Commissioner.
Fairmont Aluminum Co. v. Commissioner
Docket No. 13970.
United States Tax Court
1948 Tax Ct. Memo LEXIS 58; 7 T.C.M. (CCH) 783; T.C.M. (RIA) 48221; October 25, 1948
*58 Earl Q. Kullman, Esq., 120 Broadway, New York, N. Y., for the petitioner. J. Frost Walker, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves deficiencies as follows: Declared
Value
Excess Profits
Excess
Year
Income Tax
Tax
Profits Tax
1942
$1,130.85
$29.97
1943
88.93
15.72
1944
$110,485.50 Overpayment is claimed by the petitioner as follows: $5,813.91 income tax for 1942; $50,847.45 income tax for 1943; and $1,916.30 declared value excess profits tax for 1943. The parties have stipulated that the matter of income taxes and declared value excess profits taxes for 1942 and 1943 will be adjusted under Rule 50, therefore further examination thereof will not be made here. This leaves for consideration the matter of $110,485.50 excess profits tax for 1944, and a further question as to basis for depreciation, raised by the petition. Essentially the problem presented is: To what equity invested capital is petitioner entitled. The only facts submitted have been stipulated, including exhibits referred to in the stipulation. We find the facts as so stipulated. *59 Those considered necessary of statement for an understanding of the issue presented may be epitomized as follows: [The Facts] Petitioner is a corporation, incorporated under the law of West Virginia on September 27, 1926, as Fairmont Manufacturing Company. The name was changed in 1930 to Fairmont Aluminum Company. Petitioner's Federal returns for income, declared value excess profits and excess profits tax herein involved were filed with the collector for the district of West Virginia. From 1919 to about 1921, West Virginia Metal Products Corporation erected a brass rolling mill at Fairmont, West Virginia, on real property owned by the corporation, and installed therein substantial machinery. The plant was never placed in operation. West Virginia Metal Products Corporation sold and issued its first mortgage bonds secured by a trust indenture of all the company's real property, plant and equipment. The balance sheet of West Virginia Metal Products Corporation as of June 30, 1923, shows capital liabilities of $2,448,750 and capital assets of $2,529,774.33, consisting of real estate, plant and development $1,669,247.20, and machinery and equipment $860,527.13. There was no *60 material change in the balance sheet of West Virginia Metal Products Corporation from June 30, 1923, to March 15, 1924, when the above mortgage was foreclosed in the manner hereinafter described. Immediately prior to the institution of the foreclosure proceedings, hereinafter referred to, there were outstanding first mortgage bonds of West Virgina Metal Products Corporation in the principal amount of $1,448,405. Pursuant to foreclosure proceedings, the first mortgage bondholders organized a Bondholders Committee and proceeded to foreclose the mortgage against all the properties of West Virginia Metal Products Corporation. Pursuant thereto, the mortgage properties were transferred by the trustee under the mortgage, Fairmont Trust Company, by deed made on or about March 15, 1924, to Osman E. Swartz, A. L. Ashby and John H. Ricketson (hereinafter referred to as the "Bondholders Committee"). The Bondholders Committee then commenced arm's length negotiations with W. J. Adam, acting on behalf of himself and other individuals hereinafter collectively referred to as the "Adam Group." The Adam Group were not bondholders and were not previously identified with the management of the West *61 Virginia Metal Products Corporation. By letter directed to Ricketson, Ashby and Swartz, and dated September 29, 1926, W. J. Adam offered to purchase from them all of the land conveyed to them by Fairmont Trust Company by deed dated March 15, 1924, except two lots recited to have been theretofore sold by them, together with all buildings and improvements thereon, and all machinery and equipment listed on an inventory made by West, Flint & Company as of September 17, 1926, payment to be made by eight non-negotiable notes aggregating $550,000, secured by a deed of trust upon the property, plus 3,000 shares of common stock of Fairmont Manufacturing Company, a West Virginia corporation, being five per cent of 60,000 shares of common stock. The notes were to bear seven per cent interest from September 15, 1926, one to be payable each year. The letter stated that capital expenditures to be made in placing the property in position to operate and to provide working capital and other necessary funds will be furnished by subscription to preferred stock of the corporation at par, $200,000 presently to be subscribed, and when paid will be devoted entirely to proper corporate purposes, the subscriptions *62 to preferred stock to be by, or underwritten by, solvent persons; that in the event of acceptance of the offer, Adam might direct transfer of the assets to Fairmont Manufacturing Company and that conveyance would be made direct to the company, at Adam's instance. The offer stated that it was conditioned upon the execution, by Ricketson, Ashby and Swartz, of an agreement with the person, firm or corporation to which they make conveyance at Adam's instance substantially in the form of agreement attached as Schedule A. Schedule A, in substance, is a form of contract dated September 29, 1926, between Ricketson, Ashby and Swartz as first parties and Fairmont Manufacturing Company as second party. It recites, in pertinent part, that whereas the first parties have by deed of even date sold the second party certain real and personal property formerly owned by West Virginia Metal Products Corporation for the consideration of eight notes aggregating $550,000 and 3,000 shares of the common stock of the second party, it is, therefore, agreed that the parties of the firm part warrant title; that an inventory as of September 17, 1926, has been made by West, Flint & Company, which is believed to *63 be true and correct; that the property conveyed is that covered both by the deed and by the inventory; that the second party will not, without the consent of the first parties, release the subscription of Robert C. Adam for preferred stock of the second party to the amount of $200,000 or any guaranty of such subscription. The inventory of September 17, 1926, recites that it covers "the Machines, Machine Parts, Motors and Accessories, Power Plant, Laboratory Equipment and Photographic Equipment in the Plant formerly owned by the West Virginia Metal Products Corporation"; also that it "does not include certain Equipment and Materials, consisting of Cable Lines, Wiring, Piping, Plumbing, Sanitary Installations, Concrete Foundations, Manufacturing Materials and Supplies, which we were instructed not to list." It recites also that "a number of castings, etc." had tags attached showing "Property of holders of copy of agreement between Stockholders of the A. Garrison Foundry Co., Pittsburgh, Pa. These items have been included in our Report, and appear in Schedule #7." Schedule #7 shows 30 items listed as having such tags attached. The inventory lists the property without showing values. *64 By letter dated September 29, 1926, and directed to Fairmont Manufacturing Company, W. J. Adam stated that he had arranged to acquire the property deeded by Fairmont Trust Company to the Bondholders Committee (except the two lots by them sold) and buildings and improvements and other property listed in the inventory; that the vendor was to enter agreement substantially in the form of attached Schedule A (which is the same as the Schedule A attached to Adam's letter of September 29, 1926, to the Bondholders Committee); that he offers to have the property transferred to the company and to have the vendor execute the agreement, provided that Fairmont Manufacturing Company will pay him by issuing to him or his nominees eight nonnegotiable notes aggregating $550,000 under a deed of trust covering the property, and by issuing to him 59,975 shares of the company's common stock (the notes were described the same as in Adam's letter to the Bondholders Committee); that if the offer is accepted he will cause subscription of 2,000 shares of preferred stock of Fairmont Manufacturing Company for cash at par by solvent persons or underwritten by solvent persons. The offer was accepted by the company. *65 The Bondholders Committee by resolution dated September 29, 1926, accepted the offer from Adam, authorized execution of the agreement attached to Adam's offer, and authorized execution of a deed dated September 29, 1926, to the property to Fairmont Manufacturing Company. Petitioner's originally authorized capital stock was 2,000 preferred shares having a par value of $100 each and 60,000 common shares having no par value. The original incorporators were five individuals, nominees of the Adam Group, who subscribed for five shares each of the common stock at $20 per share, which qualifying shares were thereafter transferred to members of the Adam Group. Pursuant to the arrangements outlined above, the petitioner acquired from the Bondholders Committee all of the properties of West Virginia Metal Products Corporation. In consideration therefor, the Bondholders Committee acquired from the petitioner serial mortgage notes secured by a first mortgage on all the properties of the petitioner, which mortgage notes were in the sum of $550,000, and, in addition thereto, 3,000 shares of petitioner's no par common stock. The Adam Group, in exchange for $200,000 in cash, received from petitioner *66 200 shares of preferred stock and 56,975 shares of common stock. On December 6, 1945, the petitioner wrote to the collector at Parkersburg, West Virginia, to the effect that check was enclosed for $1,501.50 as payment of income tax deficiencies for 1942 and 1943, and interest thereon, the deficiencies depending on adjustments which the company did not intend to contest. On December 7, 1945, the collector received the sum of $1,501.50 by depositing petitioner's check which was thereafter, in due course, honored on presentment. To the check was attached a voucher, in material part reading: Federal Income Tax Deficiency
- 1942
1,190.82
Interest at 6% from March 15,
1943 to December 7, 1945
195.16
1,385.98
Federal Income Tax Deficiency
- 1943
104.65
Interest at 6% from March 15,
1944 to December 7, 1945
10.87
115.52
1,501.50
Per Internal Revenue Agent's Report dated October 26, 1945. Petitioner filed with the collector for the district of West Virginia refund claim executed March 14, 1946, as to income tax, and income and excess profits taxes for the years 1942 and 1943, in the respective amounts of $5,813.91 and $52,763.75. The deficiency *67 notice recites: "It is held that you are not entitled to any equity invested capital under Section 718 (a) (2) of the Internal Revenue Code in connection with the acquisition of certain physical assets from the former bondholders of the West Virginia Metal Products Corporation." In its corporation excess profits tax returns for the years 1942-1944, inclusive, the petitioner in computing excess profits credit based on invested capital claimed $1,726,200, consisting of $776,200 money paid in for stock or as paid-in surplus or as a contribution to capital, and $950,000 as property paid in for stock or as paid-in surplus or as a contribution to capital. In determining excess profits credit based on invested capital, as to the year 1944, the respondent deducted from $2,088,250.50, invested capital as disclosed by the return, $949,500 as "increase in basis of certain physical assets acquired in 1926 from the former bondholders of the West Virginia Metal Products Corporation not allowed," leaving invested capital as adjusted $1,138,750.50. Opinion The petitioner in its excess profits tax returns for 1942-1944, inclusive, claimed excess profits credit of $1,726,200, *68 consisting of $776,200 money paid in for stock and $950,000 property paid in for stock. Upon brief the respondent explains that he did not disallow $500 out of the $950,000 claimed in the return as invested capital for the reason that the $500 properly constituted money paid in for stock, the original incorporators of petitioner having subscribed for that amount of stock. Therefore, the $776,200 claimed as invested capital by the petitioner, plus $500, was not disallowed by the respondent. The petitioner's assignment of error on this point is, in substance, that in determining invested capital the Commissioner failed to include $2,529,774.33 as the invested capital of its predecessor, West Virginia Metal Products Corporation; also that in so determining invested capital the Commissioner erred in failing to include $1,500,000, being fair market value of the assets acquired by petitioner from West Virginia Metal Products Corporation, and in determining that petitioner is not the successor of that corporation. Upon brief petitioner states its basic contention to be that there was reorganization in the transfer of the assets of West Virginia Metal Products Corporation to its bondholders *69 on foreclosure and another reorganization in the subsequent transfer by the bondholders to the petitioner formed specially for that purpose; and that alternatively the sequence is immaterial and the two transfers are to be considered reaching the same result. The petitioner on brief argues that its basis is the substituted cost basis of West Virginia Metal Products Corporation and it inherited that company's invested capital in an amount not less than $3,897,155; also that assuming no tax-free reorganization, "petitioner's cost basis is at the fair market value' at the time the assets were transferred to it by the Bondholders Committee," as a mortgagee's basis after acquisition of the mortgagor's property upon foreclosure. The respondent replies, in substance, that he has never determined the cost basis or other basis of the property, and, in substance, states his position to be as follows: That the petitioner is not entitled to any credit for equity invested capital for property paid in for stock under section 718 (a) (2) for the reason that the Adam Group paid in $200,000, being par value, for 2,000 shares of the preferred stock under the agreement that Robert C. Adam would subscribe *70 $200,000 for preferred stock; that, therefore, the 56,975 shares of common stock also received by the Adam Group had no value, and, therefore, the 3,000 shares of common stock received by the Bondholders Committee had no value, so that the property paid in by the Bondholders Committee was not for the 3,000 shares of stock but for the notes aggregating $550,000. Respondent urges also that there was no statutory reorganization necessary to use by petitioner of substituted basis, that control did not remain in the same persons, and that the basis, either cost or substituted, has not by the petitioner been shown, the balance sheet relied upon by the petitioner not furnishing the necessary proof - as he, the respondent, had pointed out to petitioner in opening statement at trial, and prior thereto. In our view, on the facts before us, the respondent must prevail. Though the deficiency notice does not contain any determination of the basis of the property, the petitioner in the petition and on brief takes the view that the respondent erroneously failed, in determining invested capital, to include the amount either of the invested capital of the former corporation or the fair market value *71 of the assets at the time acquired. It thus became the petitioner's burden to show either the invested capital of the former corporation or the fair market value of the assets acquired from it. [Though the petitioner argues that the respondent's determination was arbitrary and capricious and therefore the burden is not on it, we do not so view the record. That idea is based in part on a contention, as to 1942 and 1943, that deficiencies were determined after payment of the tax, which obviously does not demonstrate caprice nor arbitrariness as to the year 1944, just here involved. It is further argued because it is alleged that respondent used a basis of cost instead of fair market value. The respondent denies, and the petitioner has not shown, that cost was actually used in the determination of the deficiency.] Examination of the record before us is convincing that a cost basis to the predecessor corporation has not been shown. Though a stipulation of facts was filed, the respondent's counsel at the trial specifically pointed out in his opening statement that he considered the stipulation insufficient to prove such a substituted basis, that the petitioner must so prove, and that *72 the balance sheet of the old company, though stipulated, is not sufficient proof. He also stated that by letter dated April 21, 1948, several days before trial, he had so advised petitioner's counsel. The petitioner does not deny or refute this knowledge, beforehand and at trial, of the respondent's view so, therefore, can not and does not plead surprise. The petitioner flatly at trial, replying to the view of the respondent's counsel that the balance sheet was not sufficient proof of basis, disagreed therewith and contended "the amount stated on the balance sheet is the cost basis," while on brief, referring to the balance sheet it is stated that "we submit that it is sufficient evidence for the purposes of this case." It thus appears that petitioner has knowingly, with due notice of the respondent's views, refrained from making proof of the basis contended for, other than the balance sheet - and an engineer's report, which is not discussed by him. Therefore, though reluctant to base our conclusions on failure of proof, we can only conclude that the necessary proof has not been made. The balance sheet of the predecessor corporation, without more, can not logically be regarded as proof *73 of its basis. It does not disclose the manner of acquisition of the assets by the predecessor corporation, whether by issuance of stock or for cash or in connection with a reorganization. It does not indicate necessarily whether the figures were original cost or cost less adjustments or whether inventories were at cost or on some other basis. Moreover, the balance sheet in evidence before us is that of the old corporation, at an earlier date, whereas we are just here concerned with the basis of the property transferred to the petitioner. For the balance sheet to constitute the controlling evidence which the petitioner considers it to be it would necessarily have to cover the same property conveyed to petitioner; yet the contracts between Adam and petitioner and Adam and the Bondholders Committee show that the property which passed to the petitioner did not contain two lots which had been sold by the Bondholders Committee, necessarily after the date of the foreclosure and the effective date of the balance sheet, for the property passed to the Committee on March 15, 1924, though it is agreed that there was no material change from the date thereof, June 30, 1923, to March 15, 1924. Moreover, *74 the property conveyed to the petitioner included in addition to the real estate deeded to the Bondholders Committee on March 15, 1924, (except the two lots) "all of the machinery and equipment listed on the inventory prepared by West, Flint & Company * * * as of September 17, 1926." Obviously such inventory does not necessarily contain all of the property covered by the balance sheet of June 30, 1923, or March 15, 1924. In fact, the inventory specifically recites that it covers as of September 17, 1926, "the Machines, Machine Parts, Motors and Accessories, Power Plant, Laboratory Equipment and Photographic Equipment in the Plant formerly owned by the West Virginia Metal Products Corporation," but that it "does not include certain Equipment and Materials, consisting of Cable Lines, Wiring, Piping, Plumbing, Sanitary Installations, Concrete Foundations, Manufacturing Materials and Supplies, which we were instructed not to list." It further recites that "a number of castings, etc." had tags attached reciting "Property of holders of copy of agreement between Stockholders of the A. Garrison Foundry Co." but that these items "have been included in our Report, and appear in Schedule #7." *75 Schedule #7 contains 30 items having such tags attached. It is thus apparent upon the face of the inventory that it fails to show coverage of all of the property covered by the balance sheet and, in fact, it appears to cover property owned by others. There was also stipulated in evidence an engineer's report of October 3, 1921. The petitioner does not rely upon this in his briefs. In any event, it shows on the face that it considers not only West Virginia Metal Products Corporation but Pleasant Valley Homes Company and the figures given are for "the combined properties and plants." This fact with the date of the instrument clearly renders it of no value here. In our view, therefore, we have before us no proof of the basis to the predecessor corporation, of the property conveyed, for we know nothing of the value of the two lots which had belonged to the former corporation at the effective date of the inventory (for property went by deed to the Bondholders Committee on March 15, 1924, and the two lots were sold by them). Their value may have been small or very large. The inventory of September 17, 1926, listing the property passing to the petitioner may have shown and the conveyance *76 therefore may have covered much less property than that covered by the balance sheet on June 30, 1923, or March 15, 1924, almost exactly 2 1/2 years before the inventory, and apparently not only did so but covered property appearing to belong to others than West Virginia Metal Products Corporation. Assuming that property was transferred for petitioner's stock, we are unable to say what the substituted basis thereof in the hands of the old corporation may have been. Undoubtedly no basis for some other amount of property, greater by an unknown quantity, can be used. We conclude that the petitioner has failed to show the substituted basis of the predecessor corporation. Doyle v. Mitchell Bros., 247 U.S. 179; Hollywood, Inc., 10 T.C. 175; Stock Yards Nat'l Bank v. Commissioner, 153 Fed. (2d) 708. The same indefiniteness and difference between property inventoried in September 1926 and property covered by the balance sheet of June 30, 1923, or March 15, 1924, is also fatal to the petitioner's contention that, assuming no reorganization and no substituted basis, the respondent erred in failing to include in petitioner's invested capital $1,500,000 *77 as the fair market value of the assets acquired by the petitioner from the old corporation. The date of the deed to the petitioner appears as September 29, 1926. The inventory of September 17, 1926, contains no values but is a mere list of the properties. Any attempt to arrive at values must, therefore, depend upon the balance sheet. No other attempt was made to prove the $1,500,000 fair market value. The proof is sufficient, in our view, to make even a prima facie showing of the value of the property actually transferred to the petitioner. We hold that proof of fair market value is not shown. These conclusions make it unnecessary to consider the arguments briefed by the parties as to whether or not various cases involving reorganizations and "inheriting" of bases here apply. Section 718 (d) and its reference to section 760 of the Internal Revenue Code, as cited by the petitioner, do not, in our view, alter these considerations. The petition alleges error on the part of the respondent in failing, in determining allowable depreciation of the assets which petitioner acquired from West Virginia Metal Products Corporation, to find that petitioner's basis for *78 depreciation was the adjusted cost basis to that corporation; also in failing to find that petitioner's basis was the fair market value, and in excess of $1,500,000. Not only does it follow from the conclusions to which we have above come that the petitioner has failed to show the error alleged, as to depreciation, but examination of the deficiency notice shows that allowable depreciation was reduced in certain amounts only because the estimated life of property was increased, as to 1942, and as to 1943 and 1944 allowed depreciation was reduced without explanation of the reason therefor, so that as to those years the record does not indicate the error assigned. The petitioner does not discuss the depreciation matter upon brief. We conclude and hold that the petitioner has not shown error on the part of the respondent as to the excess profits tax for 1944 or depreciation, but because of the situation and stipulation, as to the years 1942 and 1943. Decision will be entered under Rule 50.